# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

        *Plaintiff*,

    v.

MARIO A. TAYLOR,

        *Defendant.*

Criminal Action No. 17-129 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Mario A. Taylor seeks to revoke the magistrate judge's July 18, 2017 order directing that Taylor remain in custody pending trial. Dkt. 57. Taylor was arrested during an eviction conducted at 2547 Elvans Road SE #102, Washington, D.C., on June 1, 2017, which resulted in the seizure of two handguns, an AR-15 rifle, ammunition for all three weapons, and two vials that the government alleges contain Phencyclidine ("PCP"). Dkt. 59 at 2–4. He was charged by indictment with Unlawful Possession with Intent to Distribute a Mixture and Substance Containing a Detectable Amount of PCP, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C) (Count One); Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1) (Count Two); and Using, Carrying, and Possessing a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1) (Count Three). Dkt. 1. On July 11, 2017, Taylor was arraigned, and two days later a detention hearing was held. Dkt. 57 at 2; *see also* Dkt. 5. After the hearing, the magistrate judge ordered Taylor held without bond, finding that he had not overcome the presumption—triggered by Counts One and Three of the indictment—that no combination of conditions could reasonably assure the safety of the

community if he were released, and that, in any event, "detention would be required even had [Taylor] rebutted the presumption entirely." Dkt. 5 at 6.

In light of several developments since his detention hearing, Taylor now moves to revoke that pretrial detention order. Dkt. 57. The Court finds that Taylor has rebutted the statutory presumption in favor of detention triggered by the charges in this case and that the government has failed to show by clear and convincing evidence that no set of conditions exists that would reasonably assure the safety of the community. Reaching that result requires that the Court resolve two questions of first impression in this Circuit regarding the meaning of the Bail Reform Act of 1984, 18 U.S.C. § 3142 *et seq*. As explained below, the Court concludes that the second factor of the detention analysis under Section 3142—the weight of the evidence—focuses on the evidence the government may present at trial and, thus, does not include evidence that the Court has suppressed. By contrast, the fourth factor under Section 3142—the nature and seriousness of the danger to any person or the community that would be posed by release— requires the Court to consider all reliable evidence, including evidence that has been suppressed.

Applying the factors set forth in the Bail Reform Act and these legal conclusions, the Court will revoke the order of the magistrate judge and direct that Taylor be released subject to the conditions set out below.

## I. BACKGROUND

On March 31, 2017, the Superior Court of the District of Columbia issued a writ of restitution to evict Taylor from his residence at 2547 Elvans Road SE #102, Washington, D.C. Dkt. 14-1 at 3. The writ was executed on June 1, 2017. As required in the District of Columbia, the United States Marshals Service effected the eviction, with the assistance of an eviction team retained by the property owner. At the time the Deputy Marshals arrived at the residence, it was

occupied by three men (including Taylor), one woman, and one infant. The Deputy Marshals directed all of the occupants to leave the apartment, but the adults were subsequently allowed briefly to return to retrieve valuables, such as cell phones and wallets.

After approximately forty-five minutes, one of the Deputy Marshals discovered two loaded rifle magazines (for an AR-15 rifle) under a table in the dining area. Dkt. 18 (64:4–9). Although the magazines were left on the floor, they were initially obscured by clothing and other "debris." Dkt. 48 (22:10–18). Very shortly after the Deputy Marshal discovered the magazines, the eviction crew discovered two loaded, semi-automatic handguns, ammunition, and two vials in shoeboxes in one of the bedrooms. At least one of the vials contained a "brownish[,] yellowish" liquid. *Id.* (23:6–8). As is standard procedure, the Deputy Marshals contacted the Metropolitan Police Department's ("MPD") Gun Recovery Unit ("GRU"). While waiting for the GRU to arrive, the Deputy Marshals brought Taylor back into the apartment. One of them "explained to him that [they had] found contraband, [that they had] found guns and . . . told him he[] [was] not under arrest but [they would] have to detain him until MPD comes." *Id.* (14:6–9). Taylor said "something to th[e] effect" of "you're going to charge me anyways because I'm on the lease," at which point the Deputy Marshals handcuffed him. *Id.* (14:10–19).

After officers from the GRU arrived, the officers inspected the items discovered in the course of the eviction. Of particular relevance here, Officer Casey Logan examined and smelled the vials and concluded that they contained PCP. He also examined the rifle magazines, handguns, and ammunition. While the GRU remained present, moreover, a member of the eviction crew discovered a soft bag in a closet located just off of the communal living area, which he brought to Officer Logan's attention. Officer Logan entered the closet, examined the bag, felt what seemed to be a rifle, and opened the bag. Inside, he discovered an AR-15, a type

of semi-automatic rifle.  According to Officer Logan, he asked Taylor—who remained handcuffed—"about the illegal items recovered from his home," and Taylor responded "that everything recovered from the residence belong[ed] to him."  Dkt. 61 at 2 (MPD Arrest Form (June 1, 2017)); *see also* Dkt. 49 (25:9–23) (quoting grand jury testimony).  Taylor's counsel denies that he made this statement, but the defense has yet to offer any evidence or to make a proffer in support of that contention.  According to the government, the liquid contained in the vials later tested positive for PCP at a Drug Enforcement Agency ("DEA") laboratory located in Northern Virginia.

Taylor was indicted on June 29, 2017, and arraigned on July 11, 2017.  After a detention hearing, the magistrate judge found "by clear and convincing evidence that no condition or combination of conditions exist that would reasonably assure the safety of any other person or the community if [Taylor] were released," and he accordingly granted the government's motion for pretrial detention.  Dkt. 5 at 9.  Taylor did not, at that time, challenge that order under 18 U.S.C. § 3145(b), which grants persons detained by order of a magistrate judge the right to seek review by the district court.  He now contends, however, that several intervening events warrant reexamination of the magistrate judge's decision.  Among other things, Taylor points to the following developments and factual clarifications.

*First*, at the initial detention hearing, the government relied extensively on Officer's Logan's assertion that Taylor admitted that the guns and drugs belonged to him.  Dkt. 3 at 5; Dkt. 5 at 7.  The government has now conceded, however, that the statements made by Taylor in response to Officer Logan's questions must be suppressed at least for purposes of trial because he was in custody and not advised of his *Miranda* rights.  Dkt. 18 (11:1–12:14); Minute Entry (Dec. 8, 2017).

*Second*, Taylor also moved to suppress the physical evidence found in the apartment—that is, the guns, magazines, ammunition, and vials of "brownish[,] yellowish" liquid. Although the Court denied that motion, additional evidence arguably relevant to the present motion came to light in the course of the suppression hearing. For example, although the magistrate judge concluded, based on Officer Logan's grand jury testimony, that the handguns, ammunition, and purported PCP were recovered from the "main bedroom" of a two-bedroom apartment, Dkt. 5 at 2, testimony of multiple law enforcement officers established that the apartment had three bedrooms, and the government has not made any further suggestion that a one of the bedrooms was the "main bedroom." The Deputy Marshal supervising the eviction crew, moreover, testified that when Taylor was allowed to retrieve personal items from the apartment, he did not enter the bedroom where the shoeboxes containing contraband were discovered. Dkt. 48 (12:15–22). Instead, he entered a bedroom on the other side of the hallway and "grabbed . . . [a] cellphone, cellphone charger, [and] . . . a wallet." *Id.* (13:1–2). The government also presented photographic evidence that the bedroom in which the shoeboxes were found had the name "Veandre" written on one wall. *See* Dkt. 17 (describing government's photographic exhibits). Further evidence indicated that one of the other occupants present at the residence at the time the Deputy Marshals arrived was named Veandre and that a man identified as Veandre Purvis was overheard speaking to Taylor while the eviction was taking place. *See* Dkt. 44-1. Purvis, in particular, was overheard "asking why . . . Taylor had not told him that he was being evicted and was behind on his rent." Dkt. 44-1 at 1. A Deputy Marshal also testified that one of the adult occupants of the residence other than Taylor retrieved personal items from the bedroom where the shoeboxes were discovered and where "Veandre" was written on the wall. The Deputy

Marshal did not indicate whether that individual was the same individual who was later identified as Veandre Purvis.

*Third*, after the jury was selected, but before it was sworn, Taylor's counsel notified the Court of potentially exculpatory information regarding misconduct by employees of the DEA lab where the substance that the government contends is a mixture of PCP and a precursor chemical was tested. Dkt. 57 at 5–6. According to Taylor's counsel, two chemists have been "charged with criminal offenses including embezzlement and possession of controlled substances." *Id.* Defense counsel further suggested that there existed "reason to believe that this conduct may have impacted the integrity of testing conducted at the lab even if neither of the[] chemists was the lead chemist who would be called to testify in . . . Taylor's case." *Id.* at 6. As a result of this late-breaking development, the Court continued the trial to permit the parties time to investigate the matter. *See* Minute Entry (Dec. 14, 2017).

That investigation has, as of yet, been inconclusive. According to the government, one of the DEA chemists identified by Taylor's counsel was arrested on August 30, 2017, and charged under Virginia law with two counts of felony possession of oxycodone and two counts of embezzlement for purportedly obtaining oxycodone from the DEA lab's "reference materials" without authorization. Dkt. 62 at 1. She pleaded guilty to misdemeanor embezzlement on November 27, 2017. *Id.* Similar charges apparently remain pending against the other DEA employee, a DEA research chemist. The government asserts that its preliminary review indicates that neither of the allegedly offending DEA employees was assigned to Taylor's case or would have had access to the locked box that contained the vials found in Taylor's apartment. That review, however, is not yet complete. Taylor, in turn, is still waiting to receive potentially relevant information and assert that, regardless of what that evidence may ultimately show, the

government should have disclosed the arrest of the DEA employees many weeks earlier. He argues that the Court should consider that delay—and the ensuring delay in the trial date—in evaluating whether to revoke the magistrate court's detention order.

The Court held a hearing on the motion to revoke the magistrate judge's detention order on December 21, 2017, and took the motion under advisement. Trial is currently scheduled to commence on January 29, 2018.

## II. LEGAL STANDARD

Under the Bail Reform Act of 1984, 18 U.S.C. § 3142 *et seq.*, if a judicial officer finds after conducting a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e). Here, the magistrate judge concluded that Taylor does not present a risk of flight. The Court agrees with the magistrate judge's reasoning on this point, and adopts his corresponding conclusion. The Court thus need consider only whether any "condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." That prong of the pretrial detention standard requires "clear and convincing evidence" of dangerousness. 18 U.S.C. § 3142(f). "The default position of the law, therefore, is that a defendant should be released pending trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).

"That default is modified, however, for certain[] particularly dangerous defendants." *Id.* In particular, the Bail Reform Act creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure . . . the safety of the community if . . . there is probable cause to believe that the person committed" one of an enumerated list of crimes,

7

including a crime carrying a maximum term of imprisonment of ten years or more under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, or a violation of 18 U.S.C. 924(c). 18 U.S.C. § 3142(e)(2). For purposes of making that determination, "[a] grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." *Stone*, 608 F.3d at 945; *see also United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("[T]he indictment alone would have been enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community.").

Once triggered, "the presumption operate[s] *at a minimum* to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). "While the burden of production may not be heavy," *United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016) (citations omitted), the defendant must proffer "at least some evidence" or basis to conclude that the case falls "outside 'the congressional paradigm'" giving rise to the presumption. *Stone*, 608 F.3d at 945–46 (quoting *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985)); *see also United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) (finding that the presumption "represents Congress's general factual view about the special flight risks and the special risks of danger to the community presented by defendants who commit the crimes to which it attaches"). The defendant's burden, moreover, is only a burden of production; the burden of persuasion remains with the government throughout the proceeding. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *see also Alatishe*, 768 F.2d at 371 n.14 (citing *Jessup*, 757 F.2d 378, but not deciding the question).

As then-Judge Breyer explained in an opinion that the D.C. Circuit has described as "scholarly" and "extremely compelling it its rationale," *Alatishe*, 768 F.2d at 371 n.14, the

presumption is not a "bursting bubble" that becomes devoid of all force once a defendant has met his burden of production. *Jessup*, 757 F.2d at 382. The presumption does "not vanish upon the introduction of contradicting evidence," nor does the burden of persuasion shift to the defendant. *Id.* at 383 (citation omitted). Rather, even after a defendant carries his burden of persuasion, the judicial officer must "keep in mind the fact that Congress has found that" those charged with the specified offenses are likely to pose a danger to the community. *Id.* at 384. In short, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Mercedes*, 254 F.3d at 436.

The Bail Reform Act also specifies the factors that the judicial officer must "take into account" in determining whether any conditions of release "will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(g). In addition to the rebuttable presumption, the judicial officer must consider: (1) "the nature and circumstances of the offense charged, including whether the offense . . . involves . . . a controlled substance [or] firearm;" (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." *See id.*

Taylor has moved to revoke the magistrate judge's detention order under 18 U.S.C. 3145(b), which states that when "a person is ordered detained by a magistrate judge, . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. 3145(b); Dkt. 57. Although the D.C. Circuit has not decided the issue, those courts considering the question have held that a magistrate judge's detention order is subject to de novo review by the district court. *See United States v. Hunt*, 240 F. Supp. 3d 128, 132 (D.D.C. 2017) (identifying cases supporting this proposition

from the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits).

## III. ANALYSIS

### A.    Probable Cause and Presumption

As an initial matter, the Court agrees with the magistrate judge's conclusion that the presumption that no pretrial release conditions will reasonably assure the safety of the community was triggered by Taylor's indictment. Dkt. 5 at 4. Count One of the indictment charges Taylor with unlawful possession with intent to distribute PCP, which carries a maximum sentence of twenty years, and Count Three charges him with using, carrying, or possessing a firearm during a drug trafficking offense. Dkt. 1. Both of these charges fall within the list of crimes that trigger the presumption, 18 U.S.C. § 3142(f)(1); 18 U.S.C. § 3142(e)(2), and the indictment is sufficient to establish probable cause for purposes of invoking the presumption, *Smith*, 79 F.3d at 1210.

Unlike the magistrate judge, however, the Court finds that Taylor has now come forward with sufficient evidence to meet his burden of production, overcoming but not "bursting" the presumption. He has offered evidence that, if released on high intensity supervision, he could live with his sister and that his previous employer would offer him work. He stresses that he has not previously been convicted of a crime of violence. And, most notably, he points to evidence offered during the suppression hearing that calls into question the connection between him and much, if not all, of the contraband at issue and that establishes a plausible link between the contraband and a third party. Although the government points to Officer Logan's report indicating that Taylor admitted that the contraband was his, *see* Dkt. 61 at 2–3 (MPD Arrest Form (June 1, 2017)), the relevant question—at least for purposes of the presumption—is not who is correct, but simply whether Taylor has met his burden of production. The Court

concludes that he has met that modest burden and that, as a result, "the Court must . . . consider all of the factors set forth in section 3142(g)" to determine whether detention is warranted. *Hunt*, 240 F. Supp. 3d at 133.

**B.    Section 3142(g) Factors**

1.    *Nature and Circumstances of the Offense Charged*

The first factor requires the Court to consider "the nature and circumstances of the offense charged," in general, and, in specific, whether "the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device." 18 U.S.C. § 3142(g)(1). As noted above, even when the presumption created by the charged offenses has been rebutted, it is "incorporated into the other factors considered by this Court in determining whether to grant a conditional release and is given substantial weight." *Ali*, 793 F. Supp. 2d at 391. Here, the government has established probable cause to believe that Taylor committed crimes involving firearms and a controlled substance, and he faces up to twenty years in prison if convicted. The crimes charged are undeniably serious, and the combination of the distribution of drugs *and* the illegal possession of multiple guns (including an assault-style rifle that is illegal in the District of Columbia), multiple magazines, and scores of rounds of ammunition presents a serious danger to the community. The first factor thus weighs in favor of detention.

2.    *Weight of the Evidence*

Taylor's principal argument is that the weight of the evidence has shifted since the magistrate judge found that pretrial detention was warranted. The magistrate judge's detention memorandum noted, for example, that Taylor told Officer Logan "that he had resided at the apartment since 1994, [that he] had taken over the lease in 2013," and "that everything recovered from the apartment was his." Dkt. 5 at 2. Taylor's counsel disputes that he made the latter

admission.  *See, e.g.*, Dkt. 49 (22:17–39:24).  There is no dispute, however, that the statement, if

made, occurred while Taylor was in custody and before he received his *Miranda* warnings, and

the government has now conceded that the statement must therefore be suppressed for purposes

of trial.  This has removed one building block of the government's case.  At the same time,

moreover, Taylor contends that the evidence presented at a hearing regarding the suppression of

the recovered contraband affirmatively undercuts the government's contention that the guns,

ammunition, and drugs were his.  According to the defense, that evidence shows that others—

including Veandre Purvis—lived in the apartment; the two handguns, much of the ammunition,

and the two vials of "brownish[,] yellowish" liquid were found in the bedroom on the right side

of the hallway; the name "Veandre" was written on the wall of that bedroom; when allowed to

retrieve certain personal items from the apartment, Taylor went to the bedroom on the other side

of the hallway while another adult (perhaps Purvis) went to the bedroom on the right side; and

Purvis was overheard asking Taylor why he "had not told him that he was being evicted and was

behind on his rent," Dkt. 44-1 at 1.  Taylor contends that these developments substantially

weaken the government's case and that, as a result, the second factor now weighs in favor of

release.[1]  Dkt. 57 at 11–13.

When asked at oral argument how it intended to establish that Taylor possessed the guns,

ammunition, and drugs, the government responded that it will rely on a theory of "joint,

constructive possession," Motion Hearing Tr. (Rough at 32:2–33:16) (Dec. 21, 2017); that

Taylor was the lessee, the "head of the household," and was responsible for all of the items

---

[1]  Taylor also argues that the potential *Brady* violation that occurred when the government failed
to disclose the asserted misconduct at the DEA lab gives rise to an independent ground for
revoking the detention order.  Dkt. 57 at 7.  The Court cannot conclude on the existing and
undeveloped record, however, that a *Brady* violation occurred or what, if any, remedy would be
appropriate.  The Court, accordingly, will defer consideration of the *Brady* issue for a later date.

found during the eviction; that the magazines for the AR-15 were found underneath the table in the common dining area; and that those magazines fit into the AR-15 found in the common closet. The government, in addition, contends that, for purposes of determining whether pretrial detention is warranted, the Court should consider Taylor's alleged, un-*Mirandized* admission that all of the seized contraband belonged to him.

The parties' respective positions raise a host of issues. The first question is how the second Bail Reform Act factor should be applied when evaluating the danger that Taylor's release would pose to the community. At least one court has held that the "weight of the evidence" factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948; *see also Hunt*, 240 F. Supp. 3d at 134. Other courts, however, have applied the factor to consider the overall strength of the government's case. *See United States v. Johnson*, 212 F. Supp. 3d 126, 130 (D.D.C. 2016); *Ali*, 793 F. Supp. 2d at 389; Dkt. 5 at 7. And, still other courts have stressed that the Bail Reform Act "neither requires nor permits a pretrial determination of" the defendant's guilt or innocence. *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

In the Court's view, the correct approach lies somewhere between these poles. The Court is unconvinced that the "weight of the evidence" factor focuses on the defendant's danger to the community (or risk of flight) to the exclusion of any consideration of the strength of the government's case. The relevant statutory language does not focus on the evidence of danger to the community or the evidence of risk of flight; rather, it requires that the judicial officer consider "the weight of the evidence *against the person.*" 18 U.S.C. § 3142(g)(2) (emphasis added). Fairly read, that means the evidence of guilt—not dangerousness or risk of flight. The fourth factor, moreover, separately requires that the judicial officer consider "the nature and

seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). Thus, if the second factor were construed to focus exclusively on the evidence that the defendant poses a danger to the community, the fourth factor would not only overlap with, but would wholly replicate, the second factor. Reading the second factor to turn on evidence of dangerousness—as opposed to evidence of guilt of the crimes charged in the indictment—would therefore run afoul of the canon against superfluity. *See Marx v. General Revenue Corp.*, 568 U.S. 371, 385–85 (2013); *Bilksi v. Kappos*, 561 U.S. 593, 607–08 (2010).

At the same time, however, the Court recognizes that the Bail Reform Act does not purport to—nor could it, consistent with due process—authorize pretrial detention based simply on a preliminary assessment of the defendant's guilt. In sustaining the constitutionality of the Bail Reform Act, the Supreme Court emphasized that it "narrowly focuses on a particularly acute problem in which the Government interests are overwhelming"—as applied here, "the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *United States v. Salerno*, 481 U.S. 739, 750 (1987). Even overwhelming evidence of guilt would not, alone, meet that test. The second factor, accordingly, is not entirely divorced from the weight of the evidence the government will offer at trial, nor is it entirely divorced from the danger the defendant may pose to the community. The Court must, instead, review the "weight of the evidence against the" defendant as an indicia of whether any conditions of pretrial release will reasonably assure the safety of the community. If the government possesses overwhelming evidence that the defendant is guilty of the crime charged—and the nature of the charged offense involves a danger to the community—then the second factor will help meet the government's burden of persuasion. And, if the government's evidence is weak—even where the charged

offense involves a danger to the community—the government will have a more difficult row to hoe.

Determining how this factor applies to suppressed evidence—which might support the conclusion that the defendant committed the alleged crime but not the conclusion that the government is likely to prevail at trial—is less clear. The "weight of the evidence" factor dates back to the statutory predecessor to the Bail Reform Act of 1984, which permitted pretrial detention where "conditions of release [would] not reasonably assure appearance," Bail Reform Act of 1966, Pub. L. No. 89-465, 80 Stat. 214 (then codified at 18 U.S.C. § 3146(b)), but did not extend to circumstances where the defendant posed a danger to the community. Congress first experimented with an extension of pretrial detention to cases of dangerousness when it amended the District of Columbia's pretrial detention law in 1970. *See* District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. 91-358, 84 Stat. 473, 644. In addressing that provision, the House Report explained that a court's assessment of the "weight of the evidence" factor might change based on pre-trial suppression rulings. According to the Report:

> At the pretrial detention hearing, which can normally be expected to occur immediately or shortly after arrest, the judicial officer would not be expected to make formal rulings on the legality of such matters as searches, seizures, and eyewitness identification since at that time in the proceedings, such rulings would be premature. *Should, however, a defendant succeed in suppressing substantial evidence by appropriate motion following a hearing, this might well provide a basis for the court to reconsider its earlier ruling*. This procedure, it should be observed, is no different from that which exists under the Bail Reform Act.

H.R. Rep. No. 91-907, at 184–85 (1970) (emphasis added). The D.C. Court of Appeals relied on this Report language in rejecting a constitutional challenge to the updated D.C. pretrial detention law. *See United States v. Edwards*, 430 A.2d 1321, 1333 (D.C. 1981) (en banc). And, when Congress extended the concept of detention for dangerousness to federal courts in the Bail Reform Act of 1984, the Senate Report relied extensively on the D.C. experiment and the D.C.

Court of Appeals' decision in crafting the new federal law.  *See, e.g.*, S. Rep. No. 98-225, at 8–13, 22 (1983).

This history supports the conclusion that, notwithstanding the Bail Reform Act's admonition that "[t]he rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at [a detention] hearing," 18 U.S.C. § 3142(f), courts should disregard, or at least place diminished reliance on, suppressed evidence in applying the "weight of the evidence" factor.  The D.C. Circuit's decision in *United States v. Peralta*, 849 F.2d 625 (D.C. Cir. 1988) (per curiam), further supports that conclusion.  There, in considering the obverse of the present circumstances, the Court of Appeals held that the district court was authorized to reopen its prior decision granting pretrial release and to order the defendant detained, based on the district court's intervening decision declining to suppress evidence.  *Id.* at 626–27.  As the Court of Appeals explained, this "previously nonexistent, material information . . . increased the likelihood of [the defendant's] conviction."  *Id.*; *see also United States v. McCarty*, No. CR. 08-513, 2009 WL 5061577, at *4 (D. Haw. Dec. 24, 2009) (declining to consider suppressed evidence in applying the "weight of the evidence" factor).  *But see United States v. Pina-Aboite*, 97 Fed. App'x 832, 835 (10th Cir. 2004) (considering suppressed evidence in applying the "weight of the evidence" factor).

One might reasonably respond by noting that the link between the strength of the government's case and the risk of flight is far easier to discern than the link between what the government may be able to show at trial and the danger to community.  Where the government's case has been substantially weakened by a suppression order, the defendant is less likely to flee.  By contrast, the suppression of the evidence says little about whether the defendant, in fact, poses a danger to the community.  None of the materials discussed above, however, draw this

distinction.  To the contrary, the D.C. Court of Appeals' decision in *Edwards* dealt with pretrial detention aimed at protecting the safety of the community, *see* 430 A.2d at 1332–33; the two congressional reports dealt with the extension of pretrial detention to dangerous defendants; and the D.C. Circuit's decision in *Peralta* dealt with a detention order premised on both a risk of flight and danger to the community, 849 F.2d at 626.  Moreover, applying different meanings to "the weight of the evidence against the" defendant in risk of flight and dangerousness cases would invite unnecessary confusion, and, because the fourth factor already provides ample room for the Court to consider the defendant's dangerousness in light of all of the relevant information, there is no need to undertake any such contortions.  The Court, accordingly, concludes that it must reevaluate the weight of the evidence given the suppression of Taylor's alleged admission.

The significance of the suppression of this statement is bolstered by evidence offered at the hearing on the suppression of the physical evidence, which casts some doubt on whether Taylor possessed the contraband found in the bedroom.  As noted above, a motion to revoke a pretrial detention order is not the occasion to adjudicate a defendant's guilt or innocence, *see* *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (observing that "the bail statute neither requires nor permits a pretrial determination of guilty"), and that admonition makes good sense; here, for example, the government's case turns on a theory of constructive possession, but the parties have yet meaningfully to address that issue.  But, in the unusual circumstances of this case, the hurdle posed by attempting to assess the merits of the government's case is also mitigated by the fact that the Court has already heard extensive testimony from two of the Deputy Marshals present at the eviction and from one member of the GRU, and has reviewed the exhibits that the government intends to offer at trial.

Although the nuances of the government's constructive possession theory have yet to be presented, there is no doubt that it will be required to prove beyond a reasonable doubt that Taylor "knew of, and was in a position to exercise dominion and control over, the contraband." *United States v. Littlejohn*, 489 F.3d 1335, 1338 (D.C. Cir. 2007) (quoting *United States v. Byfield*, 928 F.2d 1163, 1166 (D.C. Cir. 1991)). It can do so by proving (1) that the contraband was "found in a home or bedroom where [Taylor] was the sole occupant;" (2) that Taylor shared his "home or bedroom with other persons" *and* "there [is] additional evidence linking [him] to the contraband;" or (3) that "law enforcement encountered [Taylor] in close proximity to the contraband" and "there is 'evidence of some other factor,'" such as "'connection with [the contraband], proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in the enterprise.'" *United States v. Dorman*, 860 F.3d 675, 679–80 (D.C. Cir. 2017) (quoting *United States v. Alexander*, 331 F.3d 116, 127 (D.C. Cir. 2003)). Significantly, constructive possession of "contraband found in a shared space in [a] defendant's home" can also "be shown . . . where [the contraband] was kept in plain view." *Id.* at 681.

Recognizing that the government has yet to present its case, the evidence produced to date (excluding the suppressed admission) at least suggests that Taylor was not the sole occupant of the apartment and that the handguns, some of the ammunition, and the two vials of "brownish[,] yellowish" liquid were found in another occupant's bedroom. That same evidence also suggests that those items were not in plain view—they were found in shoeboxes kept in a closet. The AR-15 rifle and associated magazines, in contrast, were found in shared spaces; the magazines were found under a table in the dining area, and the rifle was found in a closet off of a common area. The rifle, however, was not in plain view, and the question whether the magazines were in plain view may be subject to dispute. When asked at the suppression hearing

whether the magazines were "in plain view," one of the Deputy Marshal's present at the eviction testified: "In plain view. There was some debris and some clothes on the floor. Once they were moved, the clips were there on the floor." Dkt. 48 (22:15–18). Although the government might plausibly argue that "plain view" encompasses circumstances in which the contraband would be "readily visible" to an occupant in the course of everyday activity—like "opening the [kitchen] freezer or kitchen cabinet," *United States v. Harris*, 515 F.3d 1307, 1310 (D.C. Cir. 2008)— Taylor might point to authority suggesting that the contraband must be "visible to a passerby," *Dorman*, 860 F.3d at 681. For present purposes, however, the burden is on the government, and it suffices to conclude that the government has not yet provided evidence or legal analysis sufficient to allow the Court to conclude that the "weight of the evidence against" Taylor is substantial.

The Court, accordingly, finds that the second factor weighs against continued pretrial detention.

3.      *History and Characteristics of the Defendant*

The third factor requires the Court to consider (1) the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (2) whether, at the time of the current offense or arrest, the defendant was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law. 18 U.S.C. § 3142(g)(3).

Consideration of these factors does not weigh definitively in either direction. On the one hand, Taylor has been convicted of at least two serious felonies: possession of cocaine with intent to distribute, and possession of a firearm by a felon. Even more significantly, both

convictions parallel the current charges, suggesting that Taylor was not previously deterred by his prior, lengthy sentences.  But, on the other hand, Taylor's prior convictions are dated.  His conviction for possession with intent to distribute occurred almost a quarter century ago, and his conviction for possession of a firearm by felon occurred well over a decade ago.  Furthermore, the government has not presented evidence that the underlying conduct giving rise to those convictions involved violence.  In the related context of determining when the presumption in favor of detention applies, the D.C. Circuit declined to treat felon-in-possession charges, standing alone, as crimes of violence.  *See United States v. Singleton*, 182 F.3d 7, 13–14 (D.C. Cir. 1999).  To be sure, the Court of Appeals applied a "categorical approach" in reaching that conclusion, while the present question necessarily requires case-by-case consideration.  But, given the lack of evidence that Taylor, in fact, engaged in any act of violence, the Court cannot conclude that his criminal history discloses a propensity for violence.

In sum, Taylor's criminal history involves the same type of conduct at issue in the present case, and that history involves both drug trafficking *and* the illegal possession of a firearm.  This, then, at least raises the specter that he might, if released, commit just the type of offense that Congress concluded poses a unique danger to the community.  *See* 18 U.S.C. § 3142(e)(3)(B) (identifying an offense under 18 U.S.C. § 924(c) as giving rise to a presumption of dangerousness).  But, because Taylor's convictions are dated, they did not involve acts of violence, and his criminal history is not extensive, the Court will not assign significant weight to this factor.

The Court, accordingly, finds that the third factor does not tip decidedly in either direction.

4.      *Nature and Seriousness of the Danger to Any Person or the Community that Would Be Posed by the Defendant's Release*

The final factor the Court must consider is the "nature and seriousness of the danger to . . . the community that would be posed by [Taylor's] release."  18 U.S.C. § 3142(g).  Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope.  For one thing, it requires that the Court to engage in an open-ended assessment of the "seriousness" of the risk to public safety.  And, for another, unlike the "weight of the evidence" factor, the Court may consider evidence that has been suppressed for purposes of trial.  As noted above, the Bail Reform Act provides that "[t]he rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing."  18 U.S.C. § 3142(f).  The Court may, for example, consider hearsay.  *United States v. Perry*, 788 F.2d 100, 107 (3d Cir. 1986).  The Court may also consider prior arrests or charges brought against a defendant, even when those actions did not result in convictions.  *See United States v. Smith*, 160 F. Supp. 3d 280, 284 (D.D.C. 2016); *United States v. Douglas*, 535 F. Supp. 2d 118, 120 (D.D.C. 2008); *see also United States v. Jackson*, 845 F.2d 1262, 1265 (5th Cir. 1988); *United States v. Norris*, 188 F. App'x 822, 830 (11th Cir. 2006).  Thus, as a matter of statutory interpretation, it is safe to conclude that the Bail Reform Act permits consideration of evidence suppressed for purposes of trial when assessing "the nature and seriousness of the danger" to the community that would be posed by the defendant's pretrial release.

Nor do *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477 (1981), bar courts from considering un-*Mirandized*, custodial statements in applying the fourth Bail Reform Act factor, at least in the absence of any evidence of involuntariness or other police misconduct.  Although no reported decision addresses the application of *Miranda* to factor four, an analogous question has arisen in the context of sentencing, where—as in the present

context—the rules of evidence do not apply, and courts are required to consider all relevant, reliable information. *See*, *e.g.*, *United States v. Tucker*, 404 U.S. 443, 446 (1972) ("[B]efore making [a sentencing] determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come."); U.S. Sentencing Guidelines Manual § 6A1.3(a) (U.S. Sentencing Comm'n 2016) ("[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").   In that similar context, those courts of appeals that have decided the issue—the Fourth, Sixth, Seventh, and Eleventh Circuits—have all held that statements obtained by the police in violation of *Miranda* are admissible at sentencing, if otherwise reliable. *See United States v. Nichols*, 438 F.3d 437, 439–45 (4th Cir. 2006); *United States v. Graham-Wright*, 715 F.3d 598, 601 (6th Cir. 2013); *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1388 (7th Cir. 1994) (en banc); *United States v. Jackson*, No. 17-10302, 2017 WL 5495499 *4–*5 (11th Cir. Nov. 16, 2017); *cf. United States v. McCrory*, 930 F.2d 63, 68–69 (D.C. Cir. 1991) (permitting consideration of evidence obtained in violation of the Fourth Amendment at sentencing).

    As the Fourth Circuit has explained, although "statements obtained in violation of *Miranda* are inadmissible in the government's case-in-chief," this rule does not inexorably apply in other contexts. *Nichols*, 438 F.3d at 442.  Beyond the government's case-in-chief, courts must balance "the deterrent effect expected to be achieved by extending the *Miranda* exclusionary rule against the harm resulting from the exclusion of reliable evidence from the truth-finding process." *Id.* at 443.  At the sentencing phase, that balance will "normally" tilt in favor of admitting "illegally obtained but reliable evidence" because excluding the un-*Mirandized*

statement "from the government's case-in-chief at trial will provide ample deterrence against police misconduct," and "the additional deterrent effect of excluding [the] evidence from sentencing usually would be minimal." *Id.* Significantly, "absent coercive tactics by police, there is nothing inherently unreliable about otherwise voluntary statements obtained in violation of *Miranda* and *Edwards*." *Id.*

The same reasoning applies to use of otherwise voluntary, un-*Mirandized* statements in assessing the "nature and seriousness of the danger" to the community that would be posed by a defendant's pretrial release. The public interest in minimizing the danger to the community posed by a defendant under indictment for committing one of the limited offenses for which the Bail Reform Act permits pretrial detention is compelling. *See Salerno*, 481 U.S. at 748. And, in the "normal" case, the additional deterrent effect on law enforcement of declining to consider an un-*Mirandized* statement will be minimal. *Cf. McCrory*, 930 F.2d at 68. Courts, moreover, will retain discretion to accord any such statement the weight that it is due, and may—and should— decline to consider a statement in circumstances where the deterrent link is more direct, such as where there is reason to believe that the statement was taken for purposes unrelated to trial, or where there is other evidence of police misconduct. *Cf. id.* at 69. Because there is no reason to suspect any such improper motive here, the Court will consider Taylor's alleged admission in applying the fourth Bail Reform Act factor.

With that admission is mind, the Court concludes that the fourth factor weighs in favor of pretrial detention. Congress intended that the concern for community safety reflected in the Bail Reform Act "be given a broader construction than merely danger of harm involving physical violation," and, in particular, that it encompass "the risk that a defendant will continue to engage in drug trafficking." 3B Charles Alan Wright & Arthur R. Miller, *Federal Practice and*

*Procedure* § 766 (4th ed. 2013). In addition, although the mere fact that the defendant possessed a firearm does not constitute evidence of a danger to the community, possession of a firearm by a convicted felon who is allegedly engaged in illegal drug distribution is a different matter. *Cf. Singleton*, 182 F.3d at 15 (observing that holding felon-in-possession offenses to not trigger a statutory presumption of dangerousness nevertheless did "not deprive the government of an opportunity to detain armed felons when other circumstances warrant" such detention).

Accepting Officer Logan's version of events, the evidence suggests that Taylor was involved in the distribution of PCP, a particularly dangerous illegal drug; that he possessed three firearms, including an AR-15 semi-automatic rifle; and that he had scores of rounds of ammunition in his apartment. The evidence also suggests that Taylor knew that he was taking a substantial risk by possessing those firearms, but was undeterred by the fact that he had previously served thirty-seven month sentence for possession of a firearm by a felon. These facts, along with the (non-bursting) presumption that those charged with drug offenses carrying sentences of ten years or more or with the use of a gun in the commission of a drug offense pose a danger to the community, 18 U.S.C. § 3142(e)(2), convince the Court that Taylor's release would pose some risk.

The Court, accordingly, finds that the fourth factor weighs in favor of pretrial detention.

## C. Weighing the Bail Reform Act Factors

As explained above, two of the four factors weigh in favor of continued detention, one factor weighs in favor of release, and third factor does not tip decidedly in either direction. Taylor's motion, accordingly, presents a close question. On balance, however, the Court concludes that the government has not met its burden of establishing by clear and convincing evidence "that no condition or combination of conditions will reasonably assure the safety of any

other person and the community." 18 U.S.C. § 3142(f). A number of considerations bear emphasis. First, the "weight of the evidence" factor warrants particular attention in this case because the record is more substantially developed than in the typical case, and, as things currently stand, the Court is left with questions about whether and how the government will be able to meet its burden of proof at trial. Second, the record does not reveal any history of violence by Taylor. Although the Court is concerned about the multiple guns and large quantity of ammunition found in Taylor's home, it is yet to be seen whether he personally exercised any dominion or control over these items. Third, Taylor's drug conviction is almost a quarter-of-a-century old. Although sufficiently serious to warrant a ten year sentence, the underlying conduct was apparently committed when he was only about nineteen years old, and Taylor is now forty-three. Finally, the use of the high intensity supervision program and other conditions should mitigate any risk that Taylor's pretrial release might otherwise present. The Court will, for example, require that Taylor remain at his sister's residence, except under narrowly defined circumstances, and it will also prohibit Taylor from having contact with any potential witnesses without express authorization from the Court.

## CONCLUSION

For the reasons explained above, Defendant's Motion to Revoke Order of Detention, Dkt. 57, is hereby **GRANTED**, subject to the conditions set forth in an order to issue following a hearing before Magistrate Judge Deborah A. Robinson on January 3, 2018, at 1:30 p.m. in Courtroom Four. Those conditions shall include entry into the High Intensity Supervision Program; confinement to his sister's home until further order of the Court, except for meetings with counsel, to attend court proceedings, to meet with Pretrial Services, and as otherwise provided by Pretrial Services; meeting with Pretrial Services no less than once per week; no

contact with Veandre Purvis or any other potential witness in this case; no possession of firearms

or ammunition; no possession or use of any illegal drug; regular drug testing as directed by

Pretrial Services; and such further conditions that the magistrate judge conducting the hearing

finds appropriate.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: January 2, 2018