# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|                                |                                  |
|--------------------------------|----------------------------------|
| UNITED STATES OF AMERICA,      |                                  |
| v.                             | Criminal Action No. 17-129 (RDM) |
| MARIO A. TAYLOR,               |                                  |
|     *Defendant.* |                            |

## MEMORANDUM OPINION AND ORDER

Defendant Mario A. Taylor is charged with possessing a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Dkt. 79. He alleges that the government violated the Due Process Clause of the Fifth Amendment and Federal Rule of Criminal Procedure 16 by failing to collect any evidence from the crime scene other than the contraband itself. Taylor moves to dismiss the case, or in the alternative, for a curative jury instruction. Dkt. 81. The Court concludes that, on the present record, Taylor has failed to carry his burden of demonstrating a violation of either the Due Process Clause or Rule 16. Because Taylor may yet be able to make the necessary showing with respect to one or both bases of his motion, the Court will **DENY** the motion without prejudice and allow him to renew the motion, if appropriate, at trial.

## I. BACKGROUND

The relevant background of this matter began on June 1, 2017, when the U.S. Marshals Service and the Metropolitan Police Department ("MPD") discovered a number of guns, numerous rounds of ammunition, and two vials of a "brownish[,] yellowish" liquid in the course of executing a writ of restitution at 2547 Elvans Road SE, Unit #102, Washington, D.C. Dkt. 48 (23:3–8); Dkt. 49 (32:1–34:23). Taylor, who was listed on the lease for the apartment and was present at the time of the eviction, was arrested and was later indicted on charges of Unlawful

Possession with Intent to Distribute a Mixture and Substance Containing a Detectable Amount of PCP, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C) (Count One); Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1) (Count Two); and Using, Carrying, and Possessing a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1) (Count Three). Dkt. 1. After the government provided Taylor with discovery, including the MPD "Evidence Collection Log," Dkt. 11-1 at 1, Taylor moved to suppress "several statements" he allegedly made during his arrest, Dkt. 10 at 2, and "all tangible objects and photographs of all tangible objects seized" from the Elvans Road residence, Dkt. 9 at 1. The Court then held an evidentiary hearing on Taylor's motions on October 27, November 17, December 8, and December 12, 2017, at which Deputy Marshals Mark Beard and Erik Navas and MPD Officer Casey Logan testified regarding the eviction and alleged discovery of the contraband. *See* Dkt. 18; Dkt. 48; Dkt. 49; Dkt. 54.

According to that testimony, Deputy Marshals Beard, Navas, and Tawanna Gooding executed the writ of restitution on June 1, 2017, with the assistance of a privately retained eviction crew. Dkt. 18 (39:2–6). At the time the Deputy Marshals arrived at the residence, it was occupied by three men (including Taylor), one woman, and one infant. *Id.* (42:2–3). The Deputy Marshals directed all of the occupants to leave the apartment, but the adults were subsequently allowed briefly to return to retrieve valuables, such as cell phones and wallets. *Id.* (44:20–23). After approximately forty-five minutes, Deputy Marshal Gooding discovered two loaded rifle magazines (which, it was eventually determined, fit an AR-15 rifle) under a table in the dining area. *Id.* (63:22–64:9). One significant factual question for trial is whether those

magazines were in plain view, as the government contends. *See* Dkt. 90 at 2; Dkt. 48 (22:16) (describing the clips as having been found "[i]n plain view").

Shortly after Deputy Marshal Gooding discovered the magazines, the eviction crew discovered two loaded, semiautomatic handguns, ammunition, and two vials in shoeboxes in one of the bedrooms. Dkt. 48 (18:1–7). At least one of the vials contained a "brownish[,] yellowish" liquid. *Id.* (23:6–8). As is their standard procedure, the Deputy Marshals contacted the MPD's Gun Recovery Unit ("GRU"). *Id.* (15:19–25). While waiting for the GRU to arrive, the Deputy Marshals brought Taylor back into the apartment. *Id.* (14:2–4). One of them "explained to him that [they had] found contraband, [that they had] found guns" and told him "he[] [was] not under arrest, but [they would] have to detain him until MPD [came]." *Id.* (14:6–9). Taylor said "something to th[e] effect" of "[y]ou're going to charge me anyways because I'm on the lease," at which point the Deputy Marshals handcuffed him. *Id.* (14:10–19). After officers from the GRU arrived, a member of the eviction crew discovered a green bag in a closet located just off of the dining area, which he brought to Officer Logan's attention. Dkt. 49 (26:22–24). Officer Logan entered the closet, examined the bag, felt what seemed to be a rifle, and opened the bag. *Id.* (28:2–8) (quoting grand jury testimony). Inside, he discovered an AR-15, a type of semiautomatic rifle. *Id.* (12:9). The government took custody of the handguns, ammunition, AR-15, AR-15 magazines, and two vials found at the apartment, and also took photographs of the apartment and much of the evidence. *Id.* (33:4–34:10). The remaining contents of the apartment were either left on the curb for the occupants (or their friends or family)[1] to recover or were left for the rental company to clean out. Dkt. 18 (95:2–6); Dkt. 54 (7:24–8:6).

---

[1] Because Taylor was in custody, he could not himself have recovered the apartment contents that were left on the curb.

According to Officer Logan, he asked Taylor—who remained handcuffed—"about the illegal items recovered from his home," and Taylor responded "that everything recovered from the residence belong[ed] to him." Dkt. 61 at 3 (MPD Arrest Form (June 1, 2017)); *see also* Dkt. 49 (25:9–23) (quoting grand jury testimony). Through his counsel, Taylor denies that he made this statement. Dkt. 91 at 9. According to the government, the "brownish[,] yellowish" liquid contained in at least one of the vials later tested positive for PCP at a Drug Enforcement Agency ("DEA") laboratory located in Northern Virginia. Dkt. 18 (23:12). The government ultimately conceded that Taylor's statements, which were made while he was in custody and before he was advised of his *Miranda* rights, should be suppressed, and the Court suppressed that evidence. Dkt. 48 (31:9–32:2). The Court, however, denied Taylor's motion to suppress the physical evidence collected at the apartment in an oral decision issued from the bench. *See* Minute Entry (Dec. 12, 2017). The Court detailed its reasoning in that decision, and now concludes that no further explication is necessary.

Although the Court denied Taylor's motion to suppress physical evidence, it subsequently observed that evidence presented in the course of the suppression hearing raised questions about the merits of at least some of the charges contained in the original indictment. *See United States v. Taylor*, 289 F. Supp. 3d 55, 68–69 (D.D.C. 2018). In particular, the evidence showed that the handguns, the handgun ammunition, and purported PCP were recovered from a bedroom on one side of the apartment's central hallway. Dkt. 18 (61:5–17). But when the adult occupants of the apartment were allowed to reenter to recover their cellphones, cellphone chargers, and wallets, Taylor went to the bedroom on the other side of the hallway, while another occupant went to the bedroom where the contraband was found. Dkt. 48 (12:2–13:3). Moreover, the evidence showed that the name "Veandre" was written in large

lettering across the wall in the bedroom where the contraband was found. Dkt. 91 at 10 (reproducing photograph introduced into evidence at the suppression hearing). Further evidence indicated that one of the other residents at the apartment was named Veandre Purvis and that a man identified as Purvis was overheard speaking to Taylor while the eviction was taking place. *See* Dkt. 44-1. In particular, Purvis was overheard "asking why . . . Taylor had not told him that he was being evicted and was behind on his rent." *Id.* at 1.

Trial was originally scheduled to commence on December 11, 2017, but on the government's motion, the Court rescheduled jury selection for December 13, 2017. *See* Minute Entry (Dec. 8, 2017). After a jury was selected but before it was sworn, however, the parties jointly moved to continue the trial for an extended period of time to allow defense counsel time to investigate whether misconduct at the DEA lab at the which the "brownish[,] yellowish" liquid was tested could have affected the validity of any test results. *See* Minute Entry (Dec. 14, 2017). The defense sought extensive discovery related to the alleged misconduct, and the Court concluded that, in order to permit the defense adequate opportunity to investigate, it was necessary to dismiss the (unsworn) jury and to postpone the trial. *See* Dec. 14, 2017 Hrg. Tr. (Rough at 22:5–15); Minute Entry (Dec. 14, 2017). Arguing that the postponement was a product of the government's failure to provide the defense with earlier notice of the possible misconduct at the DEA lab, the defense requested that Taylor be released from pretrial custody pending trial. Dkt. 57 at 1. The Court agreed that Taylor should be released into the High Intensity Supervision Program, although on somewhat different grounds than those pressed by the defense. *See Taylor*, 289 F. Supp. 3d at 72. In particular, the Court concluded that the balance of the factors it had to consider under 18 U.S.C. § 3142(g) in determining whether Taylor's detention was appropriate had shifted in Taylor's favor based on the evidence

5

suggesting that Purvis, and not Taylor, possessed the handguns, handgun ammunition, and alleged PCP. *Id.* at 68–69, 72.

To its credit, the government also reassessed the evidence and dismissed the charges relating to the handguns, handgun ammunition, and alleged PCP. Minute Entry (Feb. 5, 2018); *see also* April 16, 2018 Hrg. Tr. (Rough at 16:2–13) ("We dismissed the charges related to the PCP and handguns because the Government reasonably believe[s] that the items in that room belonged to [Purvis]."). A retyped indictment referencing only a single count of violating 18 U.S.C. § 922(g)(1) was filed on February 12, 2018. Dkt. 79. That count related only to the alleged unlawful possession of the AR-15 and ammunition found in the AR-15 magazines. On March 12, 2018, months after the trial was originally scheduled to take place, Taylor filed the pending motion, which seeks dismissal of the retyped indictment or, in the alternative, a corrective instruction on the ground that the government should have collected and preserved additional evidence found at the Elvans Road residence. *See* Dkt. 81.

## II. ANALYSIS

Taylor alleges that the government's failure to preserve additional evidence from the crime scene violated the Due Process Clause and Federal Rule of Criminal Procedure 16. As explained below, the Court is not convinced on the present record that Taylor has established a violation of either the Constitution or Rule 16, nor can it conclude that he has shown a need for yet a further pretrial evidentiary hearing. If evidence presented at trial provides further support for Taylor's motion, he may renew his motion based on that evidence.

**A.     Due Process Clause**

The government violates the Due Process Clause of the Fifth Amendment when it "fail[s] *in bad faith* to preserve *material* and *potentially exculpatory* evidence." *United States v. McKie*, 951 F.2d 399, 403 (D.C. Cir. 1991) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

6

When evaluating whether the failure "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," violates the Due Process Clause, a defendant bears the burden of "show[ing] bad faith on the part of the police." *Youngblood*, 488 U.S. at 57–58; *accord McKie*, 951 F.2d at 403. Taylor has failed to carry that burden.

According to Taylor, the government should have, "[a]t the very least, . . . properly photographed and preserved the containers in which the alleged contraband was found—such as the . . . green lawn chair bag;" should have preserved "the belongings and other items found around and near the alleged contraband;" and should have taken photographs "of the living room as it appeared prior to when the eviction crew started moving items outside of the apartment." Dkt. 81 at 1, 4. To establish a due process violation, however, Taylor must show that the evidence he seeks was not preserved due to "bad faith on the part of the police." *Youngblood*, 488 U.S. at 58. That requirement serves two purposes: it "limits the extent of the police's obligation to preserve evidence to reasonable bounds," and it "confines" the obligation "to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id.* Those considerations apply with particular force in a case in which law enforcement officers never actually collect the evidence from the crime scene, as was true here.

Taylor identifies a number of alleged faults with the government's investigation. He has not, however, made even a prima facie showing that the government was motivated by improper purposes or tactical considerations when it failed to preserve or more thoroughly photograph the green bag, other containers in which contraband was found, the items discovered in the closet along with the AR-15, or additional items located in the living room. When the exculpatory

7

value of the evidence the government fails to preserve is apparent at the time of the evidence's loss or destruction, bad faith can be inferred from the nonpreservation itself. *Youngblood*, 488 U.S. at n.\*; *California v. Trombetta*, 467 U.S. 479, 488–89 (1984); *Magraw v. Roden*, 743 F.3d 1, 8–9 (1st Cir. 2014). In such cases, "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.\*; *see also In re Sealed Case*, 99 F.3d 1175, 1178 (D.C. Cir. 1996) (examining knowledge of police officers at the time of the nonpreservation). In contrast, when "no more can be said" of the evidence sought "than that it could have been subjected to tests, the results of which might have exonerated the defendant," *Youngblood*, 488 U.S. at 57, bad faith cannot be inferred from the mere act of nonpreservation itself, *id.*; *Magraw*, 743 F.3d at 8–9. In light of the evidence Taylor alleges the government failed to preserve, the latter standard applies. As a result, Taylor's speculation that the green bag might have "contained a card that ha[d] someone else's name on it," Dkt. 91 at 8, or might have contained some other identifying mark or forensic evidence, is insufficient to support an inference of bad faith from the bag's nonpreservation alone, *see In re Sealed Case*, 99 F.3d at 1178; *Magraw*, 743 F.3d at 8–9.

Taylor's other bases for inferring bad faith fail when considered in light of the remainder of the government's investigatory effort. He first contends that the Court can infer bad faith from the fact that the government "ignored" the evidence indicating that the handguns, handgun ammunition, and alleged PCP belonged to Purvis, and not Taylor. Dkt. 91 at 9–10. But contrary to that assertion, the doubt that was cast on Taylor's possession of those items was a product of the evidence that the government did preserve. We know about the inscription of the name "Veandre" across the wall in the bedroom where those items were found, for example, because

8

an MPD officer took a photograph of the wall. Dkt. 91-1 at 2–3. Likewise, Taylor complains about the fact that the government did not "document where in the apartment" the "mail matter" addressed to Purvis was found or the contents of those mailings, Dkt. 91 at 11–12, but it is difficult to fathom why police would have gone to the trouble of photographing the letters addressed to Purvis only to hide the fact that the mail was found in a particular portion of the apartment or to hide relevant content of the mailings. The fact that Officer Logan testified before the Superior Court that he did not find any "mail matter" in the apartment, *id.* at 11, may show that he was not aware that the mail was found or that he forgot that it was found, but it is a stretch to suggest that the police photographed the mailings at the same time that they sought to hide their existence.

Taylor also contends that the Court can infer bad faith from the investigating officers' failure to comply with two sets of MPD policies. Dkt. 81 at 10. First, Officer Logan failed to comply with his obligation to turn on his body-worn camera while investigating Taylor's apartment. Dkt. 49 (38:1–39:24). The few courts that have considered whether the failure of police officers to activate body-worn cameras is indicative of bad faith, however, have declined to reach such a conclusion on the basis of the mere failure to follow relatively new departmental policies, as was the case here. *See United States v. Brown*, No. 17-CR-58, 2017 WL 8941247, at *15–16 (D. Nev. Aug. 14, 2017) (declining to find bad faith but noting that "body cameras are new devices that officers . . . are still getting acclimated to using" and that as cameras "become more pervasive, and their use more ingrained in the culture and day-to-day routines of police officers, the Court cannot say that the absence of video evidence in violation of internal police procedures can never be suspicious or suggestive of misconduct" (internal quotation marks omitted)); *see also United States v. Cisneros*, No. 17-CR-121, 2017 WL 8810688, at *9 (D. Nev.

9

Dec. 14, 2017), *report and recommendation adopted*, No. 17-CR-121, 2018 WL 953339 (D. Nev. Feb. 20, 2018). In this case, Logan had been issued his body-worn camera less than six months before his involvement in Taylor's arrest. Dkt. 49 (38:10–12). The relevant dispute, moreover, does not turn on any information that would likely have been preserved by body-camera footage recorded by Officer Logan, who arrived on the scene after most of the contraband had been discovered and moved. Nothing presently at issue involves Officer Logan's interaction with Taylor or anyone else at the apartment. Nor is there any basis to believe that Officer Logan engaged in any misconduct at the scene, such as planting or mishandling evidence, or that he failed to activate the camera in order to hide or to obscure evidence. Rather, Taylor's sole contention is that Officer Logan and others should have taken affirmative steps to preserve additional evidence. Under these circumstances, the Court concludes that his failure to activate his body-worn camera does not constitute prima facie evidence of bad faith in failing to collect and preserve additional evidence. *See United States v. Christian*, 302 F. App'x 85, 87 (3d Cir. 2008) ("Absent some proof of ill-will, a failure to follow procedure is insufficient to support a finding of government bad faith."); *United States v. Ramos*, 27 F.3d 65, 72 (3d Cir. 1994) (same).

Second, Taylor contends that the responding officers failed to comply with MPD general orders requiring that MPD officers preserve "all potentially discoverable material that comes into the possession of the [MPD]," Dkt. 91 at 12 (quoting MPD General Order N. 601.2 (Feb. 3, 2004)), and avoid "'overlook[ing]'" evidence in the collection process, *id*. at 13 (quoting MPD General Order No. 304.8 (Apr. 30, 1992)). But, even assuming that these or other MPD general orders require GRU officers to collect and to preserve all potentially discoverable material at a crime scene, the Supreme Court's decision in *Youngblood* requires more than mere negligence or

10

oversight to establish the bad faith necessary for a due process violation. It is possible that in an extraordinary case a court might infer bad faith from an officer's failure to collect obviously material evidence. *Cf. Trombetta*, 467 U.S. 488–89 (holding that the government violates the Due Process Clause when evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means"). But here, the importance of the evidence Taylor now seeks was not so obvious as to suggest that the failure to gather and to preserve it was itself indicative of bad faith. *See Magraw*, 743 F.3d at 9 (refusing to find a due process violation "based on the unavailability of the [evidence] itself" when the defendant's support for the evidence's exculpatory value was mere "ipse dixit").

Taken together, the rock against which Taylor's claim founders is the Supreme Court's clear admonition that neither negligence nor incompleteness violates the Due Process Clause. *See Youngblood*, 488 U.S. at 58; *Lovitt v. True*, 403 F.3d 171, 187 (4th Cir. 2005) (distinguishing in the context of the *Youngblood* analysis even "a serious error in judgment" from bad faith); *United States v. Femia*, 9 F.3d 990, 995 (1st Cir. 1993) (distinguishing in the context of the *Youngblood* analysis "the government's gross negligence" from bad faith). At most, Taylor has shown that the investigation and documentation of what was found was incomplete. That may form a basis for cross-examination of the government's witnesses, but it does not rise to the level of a due process violation.

Finally, the Court notes that Taylor has suggested that he be allowed a chance to remedy any factual deficiencies in his claims through a further pretrial evidentiary hearing. Dkt. 91 at 1. But not every allegation of government bad faith requires an evidentiary hearing, and this case offers a particularly poor justification for conducting one. Defense counsel had the opportunity

11

to question two Deputy U.S. Marshals and Officer Logan about what occurred during the search of the apartment. Those examinations, to be sure, arose in the context of the hearing on Taylor's suppression motions. The examinations were, nonetheless, expansive, and they failed to reveal direct evidence of bad faith or any basis to infer it. Had Taylor raised the present motion earlier—something he could have done, given that the case nearly proceeded to trial more than six months ago—defense counsel might have engaged in an even more expansive examination of the witnesses. On the present record, however, the Court is unconvinced that Taylor has provided sufficient evidence to justify yet another round of examinations involving similar subject matter.

Because Taylor has failed to make the requisite showing of bad faith, the Court will deny Taylor's motion to dismiss or for a curative instruction for a violation of the Due Process Clause. Should the evidence at trial give reason to reconsider that conclusion, Taylor may renew his motion in light of that evidence.

**B.     Federal Rule of Criminal Procedure 16**

Taylor further argues that even absent a violation of the Due Process Clause, the indictment should be dismissed because the government violated its obligations under Rule 16(a)(1)(E), which provides:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control, and . . . the item is material to preparing the defense; . . . the government intends to use the item in its case-in-chief at trial; or . . . the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E). Rule 16 thus establishes a general obligation of disclosure, but one that is subject to several conditions. Most pertinent to the present case is the requirement that the defendant "request" an item "within the government's possession, custody, or control." For the

12

reasons discussed below, the Court concludes that the items that Taylor requests do not satisfy this condition.

The parties agree that approximately six weeks after Taylor was evicted, defense counsel requested discovery of all items discoverable under Rule 16, Dkt. 81 at 5; Dkt. 28-1 at 4, and that the government eventually allowed Taylor's lawyers to view the guns and ammunition, *see* March 19, 2018 Hrg. Tr. (Rough at 9:2–12). There is no evidence, moreover, that the government ever collected any evidence from the apartment other than the contraband itself. It thus follows, of course, that the "items" Taylor seeks were not "within the government's possession, custody, or control" at the time Taylor was indicted or when his counsel made a request under Rule 16. That, however, does not answer the central question presented by Taylor's motion, which posits that the government had an obligation to preserve all material evidence that was in the apartment at the time of the eviction and Taylor's arrest. Dkt. 81 at 5.

Taylor's leading authority for this proposition is *United States v. Bryant*, 439 F.2d 642 (D.C. Cir. 1971), in which the D.C. Circuit held that the government's discovery obligations affirmatively require it to preserve evidence in advance of a discovery request from the defense, *id.* at 653. In that case, an undercover agent from the Federal Bureau of Narcotics and Dangerous Drugs purportedly engaged in a narcotics transaction with the defendants in a motel room, while other agents tape recorded their conversation from an adjacent room. *Id.* at 645. The tape, however was "apparently . . . 'lost' somewhere at the Bureau of Narcotics and Dangerous Drugs and [was] never . . . turned over to the prosecution," or—more importantly—to defense counsel, who "heard rumors of the tape's existence" and "made repeated efforts to discover it." *Id.* at 646. On appeal, the government argued that the loss of the tape relieved it of any disclosure obligation under Rule 16, because the tape was not in its "possession, custody, or

control" for purposes of the rule at the time of the defense's discovery request. *Id.* at 650. The Court of Appeals, understandably, was unconvinced. As it explained, Rule 16 "includes no reference to the timing of possession":

> It is most consistent with the purposes of [the rule] to hold that the duty of disclosure attaches in some form once the [g]overnment has first gathered and taken possession of the evidence in question. Otherwise, disclosure might be avoided by destroying vital evidence before prosecution begins or before defendants hear of its existence.

*Id.* at 650–51. In short, the government's line of reasoning, which failed to recognize any preservation obligation prior to service of a Rule 16 request, was "far too facile" and subject to abuse. *Id.* at 650. Instead, the Court of Appeals held, even "before a request for discovery has been made," and even "during the early stages of investigation," Rule 16 imposes "a duty of preservation." *Id.* at 651.

In addition to this holding, the *Bryant* decision adopted an expansive view of the duty to preserve evidence under the Due Process Clause. *Id.* at 648. As the D.C. Circuit has recognized, however, "at least with respect to due process claims based on missing evidence the exculpatory value of which is unclear," the *Bryant* decision did not survive the Supreme Court's decision in *Youngblood*. *United States v. Vega*, 826 F.3d 514, 533 (D.C. Cir. 2016). But the D.C. Circuit has never disavowed the Rule 16 analysis contained in *Bryant*, and, accordingly, that aspect of the holding remains binding on this Court. *See id.* at 533–34 (declining to reach the question whether the Rule 16 analysis in *Bryant* survives *Youngblood*); *United States v. Bakhtiar*, 994 F.2d 970, 975 (2d Cir. 1993) (noting that "*Bryant* may still have validity after *Youngblood*"); *id.* at 976 ("[T]here may be circumstances in which government sanctions for negligent loss of evidence are appropriate, per *Bryant* . . . ."); *cf. Vega*, 826 F.3d at 533 n.7 (observing that the continuing applicability of *Bryant*'s holding with respect to the Jencks Act is unclear). More

14

recent D.C. Circuit precedent, moreover, is to similar effect, imposing obligations on the government that extend prior to any discovery request made by the defendant. In *United States v. Marshall*, 132 F.3d 63 (D.C. Cir. 1998), for example, the Court of Appeals held that the federal government "cannot be required to disclose evidence that it neither possesses nor controls," but cautioned that this is "not an invitation for the [government] to engage in gamesmanship in discovery matters" and that "a prosecutor may not sandbag a defendant by 'the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial,'" *id.* at 68–69 (quoting *United States v. Brazel*, 102 F.3d 1120, 1150 (11th Cir. 1997)).

Applying *Bryant* and its progeny, the Court concludes that the government had no obligation under Rule 16 to collect and to preserve additional evidence at the Elvans Road apartment. *Bryant* did not hold, as Taylor suggests, that the government is subject to sanction under Rule 16 if it fails to collect and to preserve all potentially relevant evidence at a crime scene. To the contrary, the Court of Appeals twice referred to the government's obligation to preserve only discoverable evidence that it had "gathered" and taken into its possession "in the course of conducting a criminal investigation." *Bryant*, 439 F.2d at 651, 652. Since *Bryant*, moreover, the D.C. Circuit has repeated this formulation of the standard. In *United States v. Weisz*, 718 F.2d 413 (D.C. Cir. 1983), for example, the Court of Appeals quoted the *Bryant* formulation, adding emphasis to the essential language: the "duty of disclosure attaches in some form *once the [g]overnment has first gathered and taken possession of the evidence* in question," *id.* at 436 (emphasis original). More recently, in *United States v. Vega*, the Court of Appeals quoted again the same passage from *Bryant*, including the "instruct[ion]" that the government must preserve "evidence gathered in the course of a criminal investigation." 826 F.3d at 533; *see*

15

*also United States v. Harrison*, 524 F.2d 421, 422 n.1 (D.C. Cir. 1975); *United States v. Duran*, 884 F. Supp. 570, 573 (D.D.C. 1995).

Here, there is no evidence that the government failed to preserve any evidence that it "gathered" at the apartment; to the contrary, Taylor's argument is that the government should have "gathered" additional evidence. That contention, however, goes well beyond any obligation that the D.C. Circuit or this Court has ever recognized. If adopted, moreover, it would substantially transform the Rule 16 *discovery* obligation into an *investigatory* obligation. Taylor, however, has failed to present the Court with any indication that the rule was ever intended to serve such a purpose and he has failed to cite a single federal decision—from any jurisdiction—embracing such an expansive view of Rule 16.

Taylor does point to a handful of decisions from the D.C. Court of Appeals adopting a reading of the District's analogous rule that seem, at least at times, to require the government to preserve evidence found at the crime scene. In *Koonce v. District of Columbia*, 111 A.3d 1009 (D.C. 2015), for example, the D.C. Court of Appeals held that the government violated Superior Court Rule of Criminal Procedure 16 when it photographed, but failed to preserve, a vodka bottle found in the defendant's car in a driving under the influence case, *id.* at 1011–12. *See also Smith v. United States*, 169 A.3d 887, 890 (D.C. 2017) (holding that the failure to collect evidence that had not been "formally seized as evidence by the government" violated Rule 16); *Robinson v. United States*, 825 A.2d 318, 328 (D.C. 2003) (holding that a recording of a call held by a prison "was in the government's 'possession' for both Jencks and Rule 16 purposes," despite the prison's lack of involvement with the investigation, merely because it *could have* been retrieved by the police). But, even assuming that the D.C. Court of Appeals has construed the D.C. rule to require preservation of evidence at the crime scene, this Court is unpersuaded that such a

16

substantial expansion of the federal rule is warranted in light of the standard articulated in *Bryant* and repeated since then, the plain language of the rule itself (which limits its reach to evidence "within the government's possession, custody, or control"), and the logic of maintaining the distinction between discovery obligations and investigatory obligations.

Taylor disagrees, arguing that the evidence he requested under Rule 16 "was clearly within the possession, custody, and control of the government." Dkt. 81 at 6. He states that courts have taken a "broad view of [the possession, custody, or control] criterion," *id.* (citing *United States v. Safavian*, 233 F.R.D. 12, 15 (D.D.C. 2005)), and he identifies testimony of government witnesses that the Marshals Service and MPD had taken "control" over the Elvans Road apartment, *id*. There is a meaningful difference, however, between broadly construing the "possession, custody, or control" criterion to apply to evidence maintained by other government agencies, *Safavian*, 233 F.R.D. at 15; *Robinson*, 825 A.2d at 326–27, and construing it to apply to evidence found in an area over which the police or other government officials have taken temporary control for purposes of conducting an investigation—or effecting an eviction. Taylor has offered no legal support for the latter construction, which would apply to virtually all crime scenes, as well as to other locations temporarily under government control for administrative purposes. His reading of "possession, custody, or control" would thereby read the "gathered" requirement out of the *Bryant* decision. More fundamentally, if correct, it would expand the scope of the Federal Rules of Criminal Procedure to govern what evidence law enforcement officers are required to collect in the first instance. That may or may not be a sound rule, but Taylor has failed to offer the Court any basis to conclude that the architects of Rule 16 ever contemplated such an application.

17

Consistent with the D.C. Circuit's admonition in a slightly different context, this reading of the rule is not an invitation to "gamesmanship in discovery matters." *Marshall*, 132 F.3d at 69. Whether under Rule 16 or the Due Process Clause, it is safe to assume that the police may not decline to "gather" evidence merely because they believe it might help the defense. This, however, is not such a case. At least on the present record, the Court is unconvinced that there is any reason to infer that the MPD or the Marshals Service failed to "gather" the green bag, the mail addressed to Purvis, or other items that were found in proximity to the contraband for any nefarious purpose—or, indeed, with any strategic or considered aim. They were not as thorough as Taylor asserts they should have been, and that is it.

Short of a showing that the government gathered and then failed to preserve evidence,[2] or engaged in gamesmanship in deciding what evidence to collect and what to leave behind, Taylor's remedy lies in cross-examination of the government's witnesses. The Court will, accordingly, deny his Rule 16 motion.

## CONCLUSION

For the reasons explained above, the Court **DENIES** Taylor's motion without prejudice.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: June 12, 2018

---

[2] For example, no evidence has been presented regarding what happened to the green bag after Officer Logan removed the firearm from it.